

# Fourth Court of Appeals

## San Antonio, Texas

## OPINION

No. 04-15-00714-CV

**WESTPORT OIL & GAS COMPANY, L.P.** n/k/a Kerr-McGee Oil & Gas Onshore, L.P.,
Appellant

v.

Betsy **MECOM**, Donald R. Mullins, Lannie Louise Mecom, Mark Mullins, and Wahatoya, Ltd.,
Appellees

From the 49th Judicial District Court, Zapata County, Texas
Trial Court No. 6,470
Honorable José A. Lopez, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Jason Pulliam, Justice

Delivered and Filed:  December 14, 2016

AFFIRMED IN PART, REVERSED IN PART, RENDERED IN PART

This is an oil and gas lease construction case; its disposition turns on the relationship between the royalty and gas purchase agreement paragraphs.  The royalty owners sued Kerr-McGee alleging underpayment of royalties.  The trial court construed the lease to determine the applicable royalty.  It calculated the royalty owed based on the gas purchase agreement's formula for calculating the minimum sales price, rather than the royalty paragraph's express provision that the gas royalty owed was a percentage of the market value at the well.

Having reviewed the lease and the applicable law, we conclude the proper construction is that the royalty owed is a percentage of the market value at the well. Thus, the trial court erred when it denied Kerr-McGee's motion for a directed verdict. Accordingly, we reverse the portion of the trial court's judgment on the breach of contract claim for underpaid royalties, declaratory judgment actions, and attorney's fees claims; render a take-nothing judgment for Kerr-McGee against the Mecoms; and affirm the remainder of the judgment.

BACKGROUND

In 1974, John W. Mecom, now deceased, leased about 8,300 acres in Zapata County to a gas producer. The gas producer's eventual successor-in-interest is Kerr-McGee Oil & Gas Onshore, LP[1]; Kerr-McGee is the appellant and defendant below. The plaintiffs below, and appellees here, are the royalty owners: Betsy Mecom, Donald R. Mullins Jr., Lannie Louise Mecom, Mark Harvey Mullins, and Wahatoya, Ltd. (collectively the Mecoms).

In the 1974 lease, paragraph 3 defines the royalty owed to the lessor for oil, gas, and sulphur, and addresses various conditions that affect the royalty owed. Paragraph 17 addresses "contract[s] for the sale of gas . . . produced from the leased premises." In 2007, Betsy Mecom, Donald R. Mullins Jr., Lannie Louise Mecom, and Mark Harvey Mullins sued Kerr-McGee for underpayment of royalties and other claims.[2] They alleged Kerr-McGee failed to accurately measure the production from the plaintiffs' wells and thus owed the plaintiffs damages for unpaid royalties. By 2010, Wahatoya, Ltd. had also become a plaintiff.

---

[1] The Mecoms sued Westport Oil & Gas Co. LP, the successor-in-interest lessee. Westport became Kerr-McGee Oil & Gas Onshore, LP, and Kerr-McGee is now a subsidiary of Anadarko Petroleum Corporation.

[2] The Mecoms sued Kerr-McGee for breach of contract for underpaid royalties and overcharged compression fees, and attorney's fees, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2014); violations of Texas Natural Resource Code sections 85.321 and 91.401, and attorney's fees, *see* TEX NAT. RES. CODE. ANN. §§ 85.321, 91.401, 91.406 (West 2011); and fraud. The Mecoms also asked the court to order an accounting and declare the correct royalty calculation and compression fees, and award attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

In Betsy Mecom's fourth amended petition and the other plaintiffs' second amended petition, they insist that the proper formula to calculate the amount of royalty owed was a formula stated in lease paragraph 17.

In Kerr-McGee's amended motion for summary judgment, it argued, inter alia, that the proper measure of royalty was paragraph 3's market value at the well provision—unaltered by paragraph 17—and the summary judgment evidence conclusively proved that Kerr-McGee's royalty payments were at least the amount owed under a market value at the well formula. Kerr-McGee also argued that because it had fully paid the royalties required by a proper construction of the lease, all of the Mecoms' other claims necessarily failed. Kerr-McGee moved for summary judgment as a matter of law against all of the Mecoms' claims including their breach of contract, fraud, and violations of the Texas Natural Resource Code claims. Kerr-McGee sought a final, take nothing judgment against the Mecoms.

The Mecoms moved for *partial* summary judgment on their declaratory judgment actions. They sought a declaration that the gas purchase agreement minimum price formula in paragraph 17 controlled over the express royalty provision in paragraph 3.

The trial court granted Kerr-McGee's motion against the Mecoms' claims of overcharged compression fees, fraud, and statutory violations, but it denied Kerr-McGee's motion against the Mecoms' breach of contract and declaratory judgment action claims. The trial court granted the Mecoms' partial summary judgment motion on their request for a declaration that paragraph 17 controlled over paragraph 3, and the case proceeded to trial.

After both sides rested, Kerr-McGee reurged a motion for directed verdict, which the trial court denied. The trial court's charge instructed the jury that under paragraph 17, the gas royalty's "market value is to be computed on the highest price paid by three separate Intrastate Purchasers of gas." The jury found that (1) Kerr-McGee failed to pay royalties based on paragraph 17's

formula, (2) Kerr-McGee's failure to comply was not excused, (3) the Mecoms were damaged in the amount of $2.3 million, and (4) reasonable attorney's fees for trial were $480,000. The trial court rendered judgment on the verdict and added prejudgment interest for a total judgment of about $4.25 million.

In its appeal, Kerr-McGee asks this court to (1) determine that the proper measure of royalty owed is based on the market value at the well—not paragraph 17's formula for gas purchase agreement minimum contract sale prices, (2) conclude that Kerr-McGee paid all royalties owed under paragraph 3, and (3) render a take-nothing judgment against the Mecoms.

Before we address Kerr-McGee's issues, we briefly recite the applicable standard of review and law for construing an oil and gas lease.

### STANDARD OF REVIEW

Whether an oil and gas lease is ambiguous is a question of law for the court. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *accord Dynegy Midstream Services, Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). "If [a] written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *accord Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). "Accordingly, [appellate courts] review lease-construction questions *de novo*." *See Anadarko Petrol. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002); *accord Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

### LEASE CONSTRUCTION

To construe an unambiguous lease, we "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *accord Hysaw*

*v. Dawkins*, 483 S.W.3d 1, 4 (Tex. 2016); *Heritage Res.*, 939 S.W.2d at 121. As we read the lease provisions, "[w]e give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res.*, 939 S.W.2d at 121; *accord Valence Operating Co.*, 164 S.W.3d at 662.

### CONSTRUING THE 1974 LEASE

#### A.  Parties' Arguments

The parties do not dispute the creation, existence, or applicability of the lease as a whole, or the applicability of the other paragraphs in the lease. They agree that paragraph 3 requires gas royalty to be paid on the market value at the well. They disagree on whether paragraph 17's gas purchase agreement minimum price formula is used to calculate the market value at the well.

The Mecoms argue that because paragraph 17 begins with "Notwithstanding any other provision of this lease," it necessarily "supplies the framework to determine [paragraph 3's definition of] 'market value at the well.'" They insist that the gas purchase agreement minimum price provision determines how to calculate the market value at the well.

Kerr-McGee argues that "[m]arket value at the well has a commonly accepted meaning in the oil and gas industry." *See Heritage Res.*, 939 S.W.2d at 122. It insists that paragraph 17's formula pertains *only* to future gas purchase agreements and does not alter the commonly accepted meaning for market value at the well, the phrase expressly stated in lease paragraph 3—the royalty clause.

#### B.  Lease Paragraph 3—Royalty Clause

The typewritten 1974 lease, not counting the exhibits, consists of fourteen pages. Lease paragraph 3 comprises just over three pages; it describes the royalties to be paid to Lessor. Subparagraph 3(a) describes the royalty due for oil as "forty-two percent (42%) of that produced

and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipeline to which the wells may be connected." Subparagraph 3(b) states the royalty owed for gas:

> (b) <u>On gas</u>, including casinghead gas and other vaporous and gaseous substances, produced from said land and sold or used off the premises, other than in the manufacture of gasoline or other products therefrom, <u>forty-two percent (42%) of the market value at the well</u> or forty-two percent (42%) of one dollar and fifty cents ($1.50) per one thousand (1,000) cubic feet (MCF), whichever shall be greater.

(emphasis added). Subparagraphs 3(b)(i)-(iv) and 3(c) comprise more than two pages of additional terms that apply to the gas royalty, but these additional terms are not at issue in this appeal. Subparagraph 3(d), also not at issue, describes the royalty due on sulphur, and 3(e) permits Lessor "to obtain gas for use as fuel only to run pumps serving to irrigate crops grown on the leased premises" but limits the amount Lessor may obtain to the amount of the gas royalty.

## C. Lease Paragraph 17—Gas Purchase Agreement Clause

Paragraph 17 reads in its entirety as follows:

> 17. <u>Notwithstanding any other provision of this lease to the contrary</u>, Lessee, or its successor or assigns, shall have the option, but not the obligation, of purchasing all or any part of the oil, gas, associated liquid hydrocarbons, and sulphur produced in conjunction therewith, produced from the leased premises; provided, however, <u>a contract for the sale of gas</u> or casinghead gas produced from the leased premises, whether Lessee be the purchaser thereunder or the purchaser be a party other than Lessee, <u>shall provide for a sale price computed on the average of the highest price paid by three separate Intrastate Purchasers of gas of like quality and quantity in Texas Railroad Commission District Four (4)</u> but shall not be less than one dollar and fifty cents ($1.50) per one thousand cubic feet (MCF). Such contract shall provide, also, for a price redetermination on the first anniversary date of the commencement of deliveries of gas provided for under such contract, and annually thereafter, such price redetermination to be computed on the same basis as provided for the initial contract price. Further, any such contract entered into by Lessee or its assigns or any other purchaser of gas, casinghead gas and/or oil produced from the lands covered by this lease shall contain a provision which shall provide for the termination of such contract in the event that Lessee, its assigns, or purchaser of such product enter into bankruptcy, receivership or trusteeship under the Federal Bankruptcy Act so that control and possession of such production is taken from Lessee or its assigns or purchaser.

(emphasis added).

**D.      Royalty, Gas Purchase Agreement Clauses' Independent Purposes**

Having read the entire lease in light of the applicable law, we agree with the parties that the questions in this appeal turn on the provisions in paragraphs 3(b) and 17. Although some leases may calculate the royalty owed based on the gas purchase agreement sale price, *see Bowden v. Phillips Petrol. Co.*, 247 S.W.3d. 690, 699 (Tex. 2008); *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981), the 1974 lease's plain language did not. The two paragraphs do not refer to each other, and there is no other lease language that makes the royalty provision subject to the gas purchase agreement minimum sales price provision.

For the reasons given below, we necessarily conclude the paragraphs at issue in this lease have independent purposes: paragraph 3 defines the royalty owed and paragraph 17 sets a minimum contract price for any future gas purchase agreement.

**E.      Determining Royalty Owed**

The Mecoms argue that because paragraph 17 begins with "Notwithstanding any other provision of the lease to the contrary," paragraph 17's formula necessarily supplants paragraph 3's market value at the well definition. They contend that paragraph 17's requirement that the gas purchase agreement sale price must be "computed on the average of the highest price paid by three separate Intrastate Purchasers of gas of like quality and quantity in Texas Railroad Commission District Four (4)" means this three-highest-prices-average becomes the formula to calculate the market value at the well. They insist that unless paragraph 17 is read as they suggest, paragraph 17 becomes meaningless, and the court may not properly adopt such a construction.[3]

---

[3] Appellees cite *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981) for the proposition that market value at the well is expressed as a price, and because paragraph 17 discusses the gas purchase agreement price, we must use paragraph 17's three-highest-prices-average formula to calculate the market value at the well. *See id.* ("Market value is defined as the price property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it."). For the reasons given in the opinion, we disagree; *Middleton* is inapt.

Although the trial court appears to have accepted the Mecoms' construction, we cannot.

First, the notwithstanding clause operates only against "any other provision of this lease *to the contrary*." Construing the plain language of the royalty and gas purchase agreement sales price provisions in light of the applicable case law, we conclude the royalty provision is not contrary to the gas purchase agreement provision and the notwithstanding clause does not elevate paragraph 17's gas purchase agreement minimum sales price over paragraph 3's express market value at the well royalty provision. *See Bowden v. Phillips Petrol. Co.*, 247 S.W.3d 690, 699 (Tex. 2008); *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 369 (Tex. 2001); *Tex. Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 870 (Tex. 1968).

Second, as the Texas Supreme Court explained, the amount of royalty owed may be entirely separate from the gas purchase agreement contract price. *See Bowden*, 247 S.W.3d at 699.

### 1. Texas Oil & Gas Corp. v. Vela

In *Vela*, the working interest owners had a problem. *Tex. Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 870 (Tex. 1968). Knowing the lease's royalty requirements, the working interest owners agreed to sell the gas they produced for a fixed price stated in the gas sales contract. *Id.* As the market value for gas rose, it far exceeded the gas sales contract price. *Id.* To defend against the royalty owners' claims for underpaid royalties, the working interest owners argued "the market price of gas within the meaning of the lease" should be based on the gas sales contract price. *Id.*

But the lease specified a royalty on gas of "one-eighth of the market value of such gas," and the court rejected the working interest owners' argument. *Vela*, 429 S.W.2d at 870–71. The amount of royalty owed "must be determined from the [royalty] provisions of the oil and gas lease, which was executed prior to and is wholly independent of the gas sales contracts." *Id.* at 870. The court determined that the royalty owed was exactly what the royalty provision required: "one-

eighth of the market value of such gas." *Id.* at 870–71. The court refused to conflate the gas sales contract price with the royalty's express market value requirement. *Id.* at 871.

### 2. Yzaguirre v. KCS Res., Inc.

In *Yzaguirre*, the royalty owners were complaining. *See Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 369–70 (Tex. 2001). When automatic increases in the lessee's gas purchase agreement (GPA) price caused the GPA price to far exceed the market value price, the royalty owners sought to have their royalties calculated on the GPA price. *Id.* at 370, 372. The lease's royalty clause stated the gas royalty would be "the market value at the well of one-eighth of the gas" sold or used off the premises. *Id.* at 372. The court, in rejecting the royalty owners' argument, noted the "[m]arket value may be wholly unrelated to the price the lessee receives as the proceeds of a sales contract." *Id.*

### 3. Bowden v. Phillips Petroleum Co.

In *Bowden*, the court relied on *Yzaguirre*, which relied on *Vela*. *Bowden v. Phillips Petrol. Co.*, 247 S.W.3d 690, 699 (Tex. 2008). *Bowden* stated that, unlike a "'[p]roceeds' or 'amount realized' [royalty] clause[]," a market value royalty clause "requires payment of royalties based on the prevailing market price for gas in the vicinity at the time of sale, *irrespective of the actual* [gas purchase agreement] *sale price*." *Id.* (emphasis added). *Bowden* recognized that the market price and "the price the operator actually obtains for the gas" may be quite different. *Id.*

*4.      1974 Lease*

Here, in the 1974 lease, the royalty provision is stated simply: "forty-two percent (42%) of the market value at the well."[4]  In light of *Bowden*, *Yzaguirre*, and *Vela*,[5] we conclude that the lease's royalty and gas purchase agreement provisions are clear and unambiguous; their meaning is not "uncertain [or] doubtful or . . . reasonably susceptible to more than one meaning," and we "will construe the [lease] as a matter of law." *See Coker*, 650 S.W.2d at 393.  The gas purchase agreement minimum sales price formula does not apply to the royalty provision, and the royalty owed is exactly what the lease states: "forty-two percent (42%) of the market value at the well." *See Bowden*, 247 S.W.3d at 699; *Yzaguirre*, 53 S.W.3d at 369; *Vela*, 429 S.W.2d at 870.

**TRIAL COURT'S JUDGMENT**

Having decided the central question in this appeal, we turn to the trial court's disposition of the lawsuit.

**A.      Kerr-McGee's Motion for Directed Verdict**

The Mecoms' petitions included requests for declaratory judgment.  The Mecoms asked the court to declare, inter alia, the correct royalty calculation under the 1974 lease.

The trial court granted Kerr-McGee's motion for summary judgment against the Mecoms' claims for compression fees overcharges, fraud, and Natural Resource Code violations, but denied the remainder of Kerr-McGee's motion.  The trial court also granted the Mecoms' motion for partial summary judgment and declared that "Paragraph 17 of the 1974 Oil & Gas Lease applies

---

[4] The lease's royalty provision sets a minimum royalty of "forty-two percent (42%) of one dollar and fifty cents ($1.50) per one thousand (1,000) cubic feet (MCF)," but the parties agree that at all relevant times the market value has been greater than $1.50 per MCF.
[5] The 1974 lease predates the *Bowden* and *Yzaguirre* cases that follow *Vela*, but *Vela* predated the lease by about six years.  *See Bowden*, 247 S.W.3d at 699 (2008); *Yzaguirre*, 53 S.W.3d at 369 (2001); *Vela*, 429 S.W.2d at 870 (1968).

to the calculation of royalty payable under the 1974 Oil & Gas Lease," and the case proceeded to trial.

After the Mecoms rested, Kerr-McGee moved for a directed verdict on multiple grounds, including that "there is no evidence or insufficient evidence of a breach of the lease contract." *See* TEX. R. CIV. P. 268 ("A motion for directed verdict shall state the specific grounds therefor."). After the charge conference but just before the charge was read to the jury, Kerr-McGee again moved for a directed verdict on the ground "there is no evidence, or insufficient evidence, to show a breach of the 1974 lease."

The trial court denied Kerr-McGee's oral motions for directed verdict.

**B.     Directed Verdict Standard of Review**

"An appeal from the denial of a motion for directed verdict is essentially a challenge to the legal sufficiency of the evidence." *Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 265 (Tex. App.—Houston [14th Dist.] 2002, pet. denied); *see City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (noting that a directed verdict is a legal sufficiency challenge). Under a legal sufficiency standard of review, we consider the evidence "in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not." *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) (citing, e.g., *City of Keller*, 168 S.W.3d at 823).

**C.     No Evidence of Breach of Contract**

In support of their breach of contract claim, the Mecoms argued Kerr-McGee breached the lease by failing to pay them royalties based on the formula provided in paragraph 17.

But to the trial court and to this court, the Mecoms admitted that, if the gas royalty is computed solely on paragraph 3's market value at the well measure, Kerr-McGee paid the Mecoms all the royalties it owed them. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905

(Tex. 2000) ("A judicial admission must be a clear, deliberate, and unequivocal statement."); *Khan v. GBAK Props., Inc.*, 371 S.W.3d 347, 357 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("A judicial admission results when a party makes a statement of fact which conclusively disproves a right of recovery or defense he currently asserts."). The Mecoms' statements were made in open court and they were "clear, deliberate, and unequivocal"; we conclude the statements were judicial admissions. *See Auld*, 34 S.W.3d at 905; *Khan*, 371 S.W.3d at 357.

Given the Mecoms' admissions that Kerr-McGee paid in full the royalties it owed the Mecoms under a market value at the well measure, and our determination as a matter of law that the proper measure of gas royalty owed was paragraph 3's market value at the well provision—unaltered by paragraph 17, we necessarily conclude there was no evidence that Kerr-McGee owed the Mecoms any unpaid royalties. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) ("[A] trial court may direct a verdict for the defendant if the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action."). Thus, the trial court erred when it denied Kerr-McGee's motion for directed verdict on the Mecoms' breach of contract claim for underpaid royalties.[6]

### D.     Mecoms' Declaratory Judgment Actions

In their declaratory judgment actions, the Mecoms petitioned for "a judicial declaration regarding the correct royalty calculation under the 1974 [lease]," a declaration "regarding the allowable deductions from royalty for compression charges," and other declarations regarding whether Kerr-McGee breached the lease and owed them attorney's fees and costs of court. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2014) (authorizing attorney's fees in a

---

[6] In one of its issues on appeal, Kerr-McGee argues the trial court erred in excluding evidence pertaining to Kerr-McGee's defenses of waiver and quasi-estoppel. Because we conclude that Kerr-McGee did not breach the lease, we need not address Kerr-McGee's defenses issue.

declaratory judgment action); *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 669–70 (Tex. 2009) (addressing the applicability—and inapplicability—of the Uniform Declaratory Judgments Act).

The trial court granted Kerr-McGee's motion for summary judgment against the Mecoms' breach of contract claim for overcharged compression fees; only the breach of contract claim for underpaid royalties remained. The remaining subissues in the Mecoms' breach of contract claim for underpaid royalties were the proper measure of gas royalty, the amount of any underpaid royalties, and whether Kerr-McGee breached the lease—the same matters on which the Mecoms sought declarations.

We conclude the Mecoms' requests for declaratory relief were "merely tacked onto a standard suit based on a matured breach of contract," *see MBM Fin. Corp.*, 292 S.W.3d at 670, and "the declarations sought by the [Mecoms] merely duplicated issues already before the trial court," *see id.* at 671.

### E.    Mecoms' Other Claims

The Mecoms also sued Kerr-McGee for breach of contract for overcharged compression fees, violations of the Texas Natural Resources Code, and fraud.

Before trial, the trial court granted Kerr-McGee's motion for summary judgment against these claims, and the Mecoms did not separately appeal the trial court's denial of these claims. The Mecoms also asked for an accounting, but the trial court's judgment did not grant the accounting, and it denied all relief not specifically granted.

### F.    Attorney's Fees

The trial court's judgment awarded the Mecoms $480,000 in attorney's fees; it recited three statutory bases to award the fees: section 91.406 of the Natural Resources Code, and sections 37.009 and 38.001 of the Civil Practice and Remedies Code. *See* TEX. NAT. RES. CODE ANN.

§ 91.406 (West 2011); TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2014); *id.* § 37.009. None of these statutes allow attorney's fees in this case.

First, the trial court granted Kerr-McGee's motion for summary judgment against the Mecoms' claims that Kerr-McGee violated provisions of the Natural Resources Code, and the Mecoms did not appeal that decision. Thus, the Mecoms are not entitled to attorney's fees under the Natural Resources Code. *See* TEX. NAT. RES. CODE ANN. § 91.406 (authorizing attorney's fees in some circumstances).

Second, because the Mecoms did not prevail on their breach of contract claim for underpaid royalties, they are not entitled to attorney's fees for breach of contract. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001; *MBM Fin. Corp.*, 292 S.W.3d at 666 ("To recover [attorney's] fees under this statute, a litigant must do two things: (1) prevail on a breach of contract claim, and (2) recover damages.").

Third, the Mecoms' declaratory judgment actions "merely duplicated issues already before the trial court," and the Mecoms are not entitled to attorney's fees under section 37.009. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; *MBM Fin. Corp.*, 292 S.W.3d at 669–71.

## CONCLUSION

In the lease at issue here, paragraph 3(b) states the gas royalty owed and paragraph 17 states the formula to calculate the minimum sale price for any gas purchase agreement. A gas royalty may be calculated on the proceeds from a gas purchase agreement contract price if the lease requires it; but in this lease, there is no such provision. Instead, the royalty clause requires a gas royalty based on the market value at the well.

Construing the 1974 lease in light of the applicable law, we conclude the lease is unambiguous, its royalty and gas purchase agreement paragraphs have independent purposes, and

paragraph 17's minimum gas sales price formula does not alter paragraph 3's gas royalty based on the market value at the well. The trial court erred when it concluded otherwise.

Because the evidence conclusively proves that Kerr-McGee paid the royalties it owed to the Mecoms, and the Mecoms' declaratory judgment actions merely duplicated the underpaid royalties breach of contract claim issues, we reverse the portion of the trial court's judgment on the breach of contract claim for underpaid royalties, declaratory judgment actions, and attorney's fees claims, and we render judgment that the Mecoms take nothing on these claims. We affirm the remainder of the judgment.

Patricia O. Alvarez, Justice