# IN THE SUPREME COURT OF TEXAS

No. 19-0459

BLUESTONE NATURAL RESOURCES II, LLC, PETITIONER

V.

WALKER MURRAY RANDLE, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS

**Argued September 17, 2020**

JUSTICE GUZMAN delivered the opinion of the Court.

This oil and gas dispute presents two contract-construction issues affecting the calculation of gas royalty payments: (1) whether the mineral lease permits deduction of postproduction costs from sales proceeds before royalties are computed; and (2) whether the lease's "free use" clause authorizes the lessee to consume leasehold gas in off-lease operations without compensating the lessors. The lower courts resolved all issues favorably to the lessors and awarded damages for underpayment of royalties. We affirm in part, reverse in part, and remand to the trial court to determine damages, if any, for off-premises compressor-fuel use.

As to the first issue, one lease provision requires the lessee to "compute and pay royalties on the gross value received" and another requires royalties to be "computed at the mouth of the

well." A provision requiring computation based on "gross value received" inherently conflicts with a computation based on value received "at the mouth of the well." The former is a gross-proceeds equivalent from which postproduction costs may not be deducted, and the latter is a net-proceeds equivalent that contemplates deductions. The lower courts correctly concluded that the lessee's deduction of postproduction costs was improper because the mineral lease explicitly resolves the conflict in favor of the gross-proceeds calculation.

The second issue is one of first impression that is also settled by the mineral-lease's language. Construed contextually, the lease's free-use clause is limited to on-lease uses. The lessee's exchange of gas to a third party for off-lease use as processing-plant fuel does not fall within the scope of the free-use clause. The lessee's on-lease use of gas for compressor fuel does, so use of that gas would be free of the royalty burden except that (1) the lessee commingles gas from the leased premises with gas from other wells and (2) the record is devoid of evidence that each leasehold's aliquot share is actually or entirely consumed by compressors on those premises.[1] The parties nonetheless stipulated that at least some of the gas is returned to at least some of the subject leaseholds in some amount. Accordingly, the compressor-fuel damages—which were awarded based on each leasehold's full aliquot share—are not conclusively established as the amount awarded. We therefore reverse that portion of the court of appeals' judgment and remand to the trial court.

---

[1] "Aliquot" refers to the fractional share of a larger whole. BLACK'S LAW DICTIONARY (11th ed. 2019).

## I. Background

In 2003, various lessors executed oil and gas leases with Quicksilver Resources. Each lease consists of a two-page form lease (Printed Lease) with an attached addendum (Addendum).[2] The Addendum states that its language "supersedes any provisions to the contrary in the printed lease[.]" Both the Printed Lease and the Addendum contain formulas for calculating royalties due under the lease.

Paragraph 3 of the Printed Lease requires the lessee to pay gas royalties based on "the *market value at the well* . . . of the gas so sold or used [off the premises]."[3] But Paragraph 26 of the Addendum states that the "[l]essee agrees to compute and pay royalties on the *gross value received*, including any reimbursements for severance taxes and production related costs[.]"[4] Paragraph 26 also includes typical "no deductions" language specifying that "royalties accruing under this lease . . . shall be without deduction" for postproduction costs.[5] The dispute here is whether royalties under the lease accrue on the gross value received or the value received net of postproduction costs. More specifically, the issue is whether the phrase "gross value received" in the Addendum conflicts with the phrase "at the mouth of the well" in the Printed Lease as necessary to invoke the Addendum's superseding clause.

---

[2] The twelve leases involved in this dispute are not identical, but the parties agree that any differences are immaterial to the issues presented. Accordingly, we refer to the leases as singular for convenience.

[3] Emphasis added.

[4] Emphasis added.

[5] The first sentence of Paragraph 26 provides: "LESSEE AGREES THAT all royalties accruing under this lease (including those paid in kind) shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and otherwise making the oil, gas and other products hereunder ready for sale or use."

For more than a decade, Quicksilver paid gas royalties on "gross value received" without deducting postproduction costs. That practice changed when BlueStone Natural Resources II, LLC acquired the mineral lease from Quicksilver in 2016 and began deducting postproduction costs under an "at the mouth of the well" computation. When royalty payments declined dramatically, four groups of lessors (the Lessors) sued BlueStone in separate suits that were later consolidated. The suits alleged BlueStone improperly deducted postproduction costs before computing royalties because the lease unambiguously requires royalties to be calculated on "gross" receipts "without deduction." BlueStone concedes that "gross value received" supersedes the Printed Lease's "market value" royalty measure, but argues that "at the mouth of the well" is the only lease language providing a valuation point, so nothing in the Addendum can be considered contradictory to that portion of the Printed Lease's royalty provision.

While litigation was ongoing, the Lessors discovered that BlueStone was not paying any royalties on commingled volumes of gas used as plant fuel by a third-party processor (Plant Fuel) or on commingled gas the fuel processor returns to BlueStone to fuel compressors on and off the leasehold premises (Compressor Fuel). BlueStone claims a contractual right to "free use" of gas without regard to whether gas is consumed on or off the leased premises so long as the use benefits or furthers the leasehold operations. BlueStone contends Plant Fuel and Compressor Fuel benefits and furthers lease operations and thus falls within the scope of each lease's free-use clause.

The contract-construction issues were resolved for the Lessors on cross-motions for traditional summary judgment and joint stipulations of fact. The trial court determined that BlueStone breached the lease by deducting postproduction costs and by failing to pay royalties on Processor Fuel and Compressor Fuel. Damages, including attorney's fees, were awarded in accordance with the stipulations. With regard to Plant Fuel and Compressor Fuel, the parties

4

stipulated to the value of the aliquot (i.e., fractional) share of the commingled mass that was attributable to each lease, and the trial court awarded damages commensurate with each lease's fractional share.

The court of appeals affirmed.[6] Regarding deduction of postproduction costs, the court held that the Printed Lease's "at the mouth of the well" royalty provision is contrary to, and conflicts with, the Addendum's "gross value received" royalty provision.[7] The court concluded that the royalty provisions could not be harmonized because precedent establishes that an "at the mouth of the well" royalty clause permits the lessee to calculate royalties by subtracting postproduction costs from the amount realized in a sales transaction while "gross value received" is a "pure-proceeds" clause that entitles the lessor to a royalty payment unburdened by postproduction costs.[8] Applying the parties' express agreement that Addendum provisions supersede contrary Printed Lease provisions, the court agreed with the trial court that BlueStone breached the lease by calculating royalties on a net-proceeds basis.[9]

In so holding, the court rejected BlueStone's argument that our recent opinion in *Burlington Resources Oil & Gas Co. LP v. Texas Crude Energy, LLC*[10] gives "at the well language" decisive force when present.[11] The court found *Burlington Resources* distinguishable

---

[6] 601 S.W.3d 848, 853 (Tex. App.—Fort Worth 2019).

[7] *Id.* at 865-66.

[8] *Id.* at 865.

[9] *Id.* at 868-69.

[10] 573 S.W.3d 198 (Tex. 2019).

[11] 601 S.W.3d at 866-68.

because it did not involve a lease containing conflicting royalty measures or a provision dictating how to resolve the conflict.[12]

The court of appeals further held that the free-use clause in the lease does not apply to off-site uses and, as established by the values in the joint stipulations, BlueStone necessarily received a quantifiable economic benefit from using the leasehold gas as Plant Fuel and Compressor Fuel.[13] Accordingly, the Lessors were entitled to royalties on the stipulated value. In affirming the damages award for Compressor Fuel, the court observed that by commingling the gas from the Lessors' leases with gas from other leases, BlueStone bore the burden of accounting for the portion of commingled gas that was returned to compressors on the subject leases.[14] The court held that BlueStone failed to meet that burden and instead merely deducted each lease's entire fractional share from the royalty calculation: "[BlueStone] never tells us or points to anything in the record that explains why it [is able to] make the allocation of commingled gas to pay royalty but why it cannot make a corresponding allocation to establish which portion of the commingled gas is used to power compressors on the [plaintiffs'] leases and on leases owned by other lessors."[15]

BlueStone's petition for review assails the lower courts' construction of the royalty and free-use clauses and seeks vacatur or remand of the attorney's fee award if summary judgment is reversed in whole or part. Texas Oil & Gas Association filed an amicus brief supporting BlueStone's argument that "at the mouth of the well" language from the Printed Lease may be

---

[12] *Id.* at 866-67.

[13] *Id.* at 874-77.

[14] *Id.* at 877 & n.20 (quoting *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812 (Tex. 1974)).

[15] *Id.* at 877.

6

combined with "gross value received" language in the Addendum without creating a conflict. Texas Land & Mineral Owners Association, National Association of Royalty Owners-Texas, and Texas Pacific Land Trust jointly filed an amicus brief supporting the Lessors' view that valuation based on "gross" proceeds cannot be harmonized with an "at the mouth of the well" valuation because the terms are functional antonyms.

We granted BlueStone's petition to address the argument that *Burlington Resources* makes "at the mouth of the well" language controlling.

## II. Discussion

### A. Postproduction Costs

Production is the process of bringing minerals to the surface, and production for raw gas occurs at the wellhead.[16] A royalty payment, which represents a lessor's fractional share of production from a lease,[17] may be calculated at the wellhead or at any downstream point, depending on the lease terms.[18] Gas royalties are generally free of the expenses incurred to extract raw gas from the land (production costs) but not expenses incurred to prepare raw gas for

---

[16] *See* 8 WILLIAMS & MEYERS OIL AND GAS LAW, *Manual of Oil & Gas Terms*, at 833 (2020).

[17] *U.S. Shale Energy II, LLC v. Laborde Props., L.P.*, 551 S.W.3d 148, 154 (Tex. 2018) (noting a "royalty" is generally defined as "the landowner's share of production, free of expenses of production").

[18] *See Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019) ("[T]he parties are free to contract for a royalty calculated based not on the value of the oil and gas at the well but on its value at the point of sale.").

downstream sale (postproduction costs).[19]  Because mineral leases are contracts, these general rules may be modified as the parties see fit.[20]  The question here is whether the parties did so.

Interpretation of a contract involves questions of law we consider de novo.[21]  Our sole objective is to ascertain the parties' true intentions as expressed in the writing.[22]  As with any other contract, we construe the mineral lease as a whole and interpret the language according to its plain, ordinary, and generally accepted meaning unless the lexical environment demands otherwise.[23]  An unambiguous contract—one whose meaning is certain and definite—will be enforced as written.[24]  In this case, the parties have also agreed that, to the extent any ambiguity arises from conflicting lease language, the Addendum will take precedence.

Two royalty provisions are at issue, one specifying a "market value at the mouth of the well" calculation and the other requiring computation based on "gross value received" "without deduction."  While the parties agree that Addendum language supersedes contrary provisions in the Printed Lease, they do not agree that a conflict exists.  BlueStone contends the royalty provisions can be partially merged and harmonized to avoid a conflict while the Lessors maintain the royalty language is inherently inconsistent whether combined or not.

---

[19] *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 3 (Tex. 2014); *see Chesapeake Expl., L.L.C. v. Hyder*, 483 S.W.3d 870, 872-73 (Tex. 2016) (postproduction costs include expenses for taxes, processing, and transportation).

[20] *See French*, 440 S.W.3d at 3.

[21] *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018) ("Both the presence of ambiguity and interpretation of an unambiguous contract are questions of law we review de novo using well-settled contract-construction principles.").

[22] *Burlington Res.*, 573 S.W.3d at 202-03.

[23] *Id*. at 203.

[24] *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1981).

Allocation of postproduction costs is a frequently litigated issue. Sometimes the terms of a lease are clear, and sometimes not. As a helpful construct, the court of appeals cited a law review article describing the basic structure of a royalty clause as "commonly having the mechanics of 'at least three components: (i) the royalty fraction—e.g., 1/8th, 25%, 1/5th; (ii) the yardstick—e.g., market value, proceeds, price; and (iii) the location for measuring the yardstick—e.g., at the well, at the point of sale.'"[25] Following this paradigm, BlueStone does not dispute that the Addendum provides both a superseding royalty fraction and a superseding yardstick. BlueStone argues, however, that the Addendum lacks the third element—a valuation point—so the Printed Lease's "at the mouth of the well" valuation point may be freely appended to the Addendum's "gross value received" language without conflict. The Lessors maintain that "gross value received" is equivalent to gross proceeds and is self-inclusive of both the yardstick and the valuation point, with "received" referring to the proceeds actually obtained at the point of sale[26] and "gross" meaning without deduction.[27]

To put the parties' lease-construction arguments in context, we start with a brief primer on royalty clauses and "the nuances in arcane oil and gas terminology that impact the question of the allocation of post-production costs."[28]

---

[25] 601 S.W.3d at 856 (quoting Byron C. Keeling, *In the New Era of Oil & Gas Royalty Accounting: Drafting a Royalty Clause That Actually Says What the Parties Intend It to Mean*, 69 Baylor L. Rev. 516, 520 (2017)).

[26] *See Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 699 (Tex. 2008).

[27] *See Chesapeake Expl., LLC v. Hyder*, 483 S.W.3d 870, 874 (Tex. 2016).

[28] *See BlueStone Nat. Res. II, LLC v. Randle*, 601 S.W.3d 848, 855 (Tex. App.—Fort Worth 2019), *aff'd in part & rev'd & remanded in part on other grounds*, ___ S.W.3d ___ (Tex. 2021).

## 1. Overview

"Market value" means "the price a willing buyer under no compulsion to buy will pay to a willing seller under no compulsion to sell."[29] But "the price paid under a gas purchase contract between the lessee and the purchaser is not necessarily the market price within the meaning of the lease."[30] Sometimes market value is more than the sales price and sometimes less.[31] Mineral leases may account for market fluctuations by setting a ceiling or a floor to address disparities between market value and contract prices.[32]

The preferred method of determining market value is by using actual sales that are "comparable in time, quality, quantity, and availability of marketing outlets."[33] When comparable sales data is unavailable, an alternative methodology for determining "market value" at a specified valuation point is the "net-back" or "workback" method. When the location for measuring market value is "at the well" (or equivalent phrasing), the workback method permits an estimation of

---

[29] *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 125 (Tex. 1996) (Owen, J.) (plurality op.) (referencing *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981)). JUSTICE OWEN's concurring opinion, which had initially been joined only by then-JUSTICE HECHT, became the plurality opinion on rehearing. JUSTICE BAKER had initially delivered the opinion of the Court, joined by CHIEF JUSTICE PHILLIPS, JUSTICE CORNYN, JUSTICE ENOCH, and JUSTICE SPECTOR. *Id*. at 120. JUSTICE GONZALEZ, joined by JUSTICE ABBOTT, dissented. *Id*. at 131. On rehearing, JUSTICE ENOCH recused himself; CHIEF JUSTICE PHILLIPS joined JUSTICE OWEN's opinion; and JUSTICE CORNYN and JUSTICE SPECTOR joined the dissent. 960 S.W.2d 619, 620 (Tex. 1997) (Gonzalez, J., dissenting on denial of motion for rehearing).

[30] *Heritage Res.*, 938 S.W.2d at 125 (plurality op.) (citing *Tex. Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 871 (Tex. 1968)); *see Yzaguirre v. KCS Res., Inc*., 53 S.W.3d 368, 372 (Tex. 2001) ("Market value may be wholly unrelated to the price the lessee receives as the proceeds of a sales contract.").

[31] *Yzaguirre*, 53 S.W.3d at 372-73 (discussing the difference between market value and proceeds).

[32] *See, e.g.*, *Westport Oil & Gas Co., L.P. v. Mecom*, 514 S.W.3d 247, 251 (Tex. App.—San Antonio 2016, no pet.) (lease provision calculated royalties as a percentage of "the market value at the well" or at a specified rate, "whichever shall be greater").

[33] *Heritage Res.*, 939 S.W.2d at 125 (plurality op.); *id.* at 122 (Baker, J.).

10

wellhead market value by using the proceeds of a downstream sale and subtracting postproduction costs incurred between the well and the point of sale.[34]

Strictly speaking, the workback method is not a net-proceeds calculation; rather, it is a market-value proxy.[35]  Because postproduction costs are not incurred until after gas leaves the wellhead, and because postproduction costs add value to the gas, backing out the necessary and reasonable costs between the sales point and the wellhead is accepted as an adequate approximation of market value at the well.[36]  Stated differently, "[t]he value of gas 'at the well' represents its value in the marketplace at any given point of sale, less the reasonable costs to get the gas to that point of sale[.]"[37]  The workback method is based on the premise that "[o]il and gas production is less valuable at the wellhead because any arm's length purchaser will assume that it will have to incur the costs to remove impurities from the production, to transport it from the wellhead, or otherwise to get it ready for sale to a downstream market or the general public."[38]

When a mineral lease requires royalty to be computed "at the well," the royalty interest bears its usual share of postproduction costs.  Although conceptually distinct from a net-proceeds royalty, the workback method functions similarly by using sales proceeds as a starting point and

---

[34] *Id.* at 122 & 125.

[35] *See Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 135 (Tex. 1996) ("[M]arket value at the well . . . means value at the well, net of any value added by compressing the gas after it leaves the wellhead."); *Heritage Res.*, 939 S.W.2d at 130 (plurality op.) ("Value at the well is already net of reasonable marking costs. . . . [L]aw and economics tell us that there are no marketing costs to 'deduct' from value at the wellhead.").

[36] *Heritage Res.*, 939 S.W.2d at 125 (plurality op.); *see Chesapeake Expl., LLC v. Hyder*, 483 S.W.3d 870, 873 (Tex. 2016) ("The market value at the well should equal the commercial market value less the processing and transporting expenses that must be paid before the gas reaches the commercial market.").

[37] *Heritage Res.*, 939 S.W.2d at 125 (plurality op.).

[38] Byron C. Keeling, *In the New Era of Oil & Gas Royalty Accounting: Drafting a Royalty Clause That Actually Says What the Parties Intend It to Mean*, 69 Baylor L. Rev. 516, 524-25 (2017).

11

netting postproduction costs back to the wellhead.[39]  The formulation of the royalty provision in the Printed Lease reflects the general rule that the lessor must share postproduction costs.

"'Proceeds' or 'amount realized' clauses require measurement of the royalty based on the amount the lessee *in fact receives* under its sales contract for the gas," regardless of whether it is more or less than market value.[40]  In common parlance, the "proceeds" of a sales transaction may be either the gross amount received or the net amount remaining after deductions.[41]  Whether a mineral lease requires one or the other depends on the contract language.[42]

As a general proposition, a royalty clause based solely on the price actually received is "sufficient in itself to excuse the lessors from bearing postproduction costs."[43]  That is, an "amount realized" clause, standing alone, creates a royalty interest that is free of postproduction costs.[44]  A modifier matters, however, and a royalty provision based on "the amount realized" can either bear postproduction costs or not depending on the contractual context.[45]

---

[39] *See Judice*, 939 S.W.2d at 135 ("'[M]arket value at the well' . . . means value at the well, net of any value added by compressing the gas after it leaves the wellhead.").

[40] *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 699 (Tex. 2008) (emphasis added).

[41] *Cf. Aerospace Optimist Club of Fort Worth v. Tex. Alcoholic Beverage Comm'n*, 886 S.W.2d 556, 559 (Tex. 1994) (defining "proceeds" according to its plain meaning as being either gross or net of deductions); *accord ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 847 (N.M. 2012) ("Oil and gas leases may specify payment of royalty upon a number of different measures; among them are net proceeds, gross proceeds and market value.").

[42] *See Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2018).

[43] *Chesapeake Expl., LLC v. Hyder*, 483 S.W.3d 870, 873 (Tex. 2016) (applying a royalty clause based on the price "actually receive[d] by Lessee").

[44] *Burlington Res.*, 573 S.W.3d at 204 ("This Court and other courts have recognized that an agreement to value a royalty interest based on the 'amount realized,' or similar language, can grant the royalty holder the right to a percentage of the sale proceeds with no adjustment for post-production costs."); *see Warren v. Chesapeake Expl., L.L.C.*, 759 F.3d 413, 417 (5th Cir. 2014) ("Had the lease provided only that the Warrens are to receive 22.5% of the amount realized by Lessee, there would be little question that the Warrens would be entitled to 22.5% of the sales contract price that the lessee received, with no deduction of post-production costs.").

[45] *Burlington Res.*, 573 S.W.3d at 205; *see Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 136-37 (Tex. 1996) (holding term "gross proceeds realized at the well" was ambiguous about whether royalty bore postproduction costs but "net proceeds realized at the well" unambiguously required the lessor to share the cost of postproduction expenditures).

In that vein, we held in *Burlington Resources* that an "amount realized" valuation modified by "net" language does not relieve the royalty holder of the usual obligation to share postproduction costs.[46] The instruments at issue there required royalty to be paid on "the amount realized" but also included language requiring royalties to be delivered "into the pipelines, tanks or other receptacles with which the wells may be connected," which we determined to be an "at the well" analog.[47] Because an "at the well" valuation point functions as a net-proceeds calculation, we held that the lease's "into the pipelines" language modified the otherwise unadorned "amount realized" language, giving the lessee the right to subtract postproduction costs from downstream sales proceeds.

Our review of the contract language accorded not only with its plain meaning but also with contemporaneously executed transaction documents requiring the operator to account for "the actual net proceeds received."[48] We further observed that our analysis was consistent with the Fifth Circuit's opinion in *Warren v. Chesapeake Exploration, L.L.C.*, which stated the general principle that unmodified "amount realized" language does not authorize deduction of postproduction costs, but such costs are deductible when "amount realized" language is modified by an "at the well" valuation point.[49] The upshot is that, even with a proceeds clause, parties can agree to allocate postproduction costs in any way they desire, including by moving the point of valuation in a way that reflects a net-proceeds computation.

---

[46] *See Burlington Res.*, 573 S.W.3d at 208-09.

[47] *Id.* at 210-11.

[48] *Id.* at 208-09.

[49] *Id.* at 211; *see Warren*, 759 F.3d at 417-18 ("Had the lease provided only that the Warrens are to receive 22.5% of the amount realized by Lessee, there would be little question that the Warrens would be entitled to 22.5% of the sales contract price that the lessee received, with no deduction of post-production costs. But that is not what the lease provides. There is a further proviso, which is that the amount realized is to be 'computed at the mouth of the well.'").

When used in conjunction with "amount realized" or similar language, "at the well" is as much a valuation method as it is a valuation point. When proceeds are valued in "gross," however, the valuation point is necessarily the point of sale because that is where the gross is realized or received. If our jurisprudence is less than precise in articulating some of these concepts, it is nonetheless clear that royalties computed on gross amounts received means royalties are paid based on point-of-sale proceeds without deduction of postproduction costs.[50] The Addendum's verbiage is broader than a typical proceeds clause by requiring royalties to be calculated on "gross *value received*," which refers to all consideration received,[51] but its breadth does not alter the salient point that the language in Paragraph 26 of the Addendum specifies a royalty free of postproduction costs.[52]

## 2. Analysis

With the basic parameters in mind, we address the critical interpretive inquiry here: whether the Printed Lease's net-proceeds-equivalent formulation can be harmonized with, and essentially override, the Addendum's gross-proceeds language. BlueStone argues that the lease's "gross value received" term can be melded with an "at the well" valuation point to produce a

---

[50] *See Judice*, 939 S.W.2d at 136 ("The term 'gross proceeds' means that the royalty is to be based on the gross price received by [the working interest owner].").

[51] "Value received" means "[c]onsideration that has been delivered." BLACK'S LAW DICTIONARY (11th ed. 2019); *see id.* (defining "value" as the "monetary worth or price of something; [or] the amount of goods, services, or money that something commands in an exchange").

[52] "'Gross' means '[u]ndiminished by deduction; entire." *Chesapeake Expl. v. Hyder*, 483 S.W.3d 870, 874 (Tex. 2016) (quoting BLACK'S LAW DICTIONARY 818 (10th ed.)).

net-proceeds calculation. But on that point, we cannot agree because "gross" and "net" terms do not peaceably coexist.

We said exactly that in *Judice v. Mewbourne Oil Co.*, regarding a provision requiring royalty to be paid on "gross proceeds received at the well."[53] That phrase is substantially similar to the conjoined one BlueStone presses here—"gross value received at the well"—and we held in *Judice* that joinder of the terms "gross proceeds" and "at the well" gives rise to "an inherent conflict" that renders a royalty clause ambiguous.[54] That is so, we explained, because "at the well" is a net-proceeds equivalent that contemplates deductions while gross proceeds "indicates just the opposite."[55] Importantly, we also held that a royalty provision based on "net proceeds realized at the well" was unambiguous and internally consistent because "net proceeds expressly contemplates deductions" and "'at the well' means before value is added by preparing the gas for market."[56]

In *Burlington Resources*, the valuation clause did not specify whether "amount realized" was gross or net, so giving effect to other language in the agreement requiring royalties to be delivered "into the pipelines" created no inconsistency. BlueStone nonetheless contends that *Burlington Resources* treats "at the well" language as a "trump" card that supersedes "amount realized" language without regard to other lease terms requiring royalty calculation on the "gross" and without regard to the parties' own agreement about what language controls in the event of a

---

[53] 939 S.W.2d 133, 136 (Tex. 1996) (Owen, J.) (plurality op.). *Judice* involved division-order language, but the parties agreed those orders governed the payment of royalty. *Id.* at 135.

[54] *Id.* at 136.

[55] *Id.* ("The term 'gross proceeds' means that the royalty is to be based on the gross price received by [the lessee]. The use of the term 'at the well' indicates just the opposite, that the royalty is to be based on its 'value at the well' [which contemplates deductions on a net proceeds basis]." (internal citation omitted)).

[56] *Id.* at 135 & 137.

conflict. BlueStone cites the following passage from *Burlington Resources* as dictating this conclusion:

> We have never held that an "amount realized" valuation method frees a royalty holder from its usual obligation to share post-production costs even when the parties have agreed to value the royalty interest at the well.
>
> . . . .
>
> We have never construed a contractual "amount realized" valuation method to trump a contractual "at the well" valuation point. To the contrary, prior decisions suggest that when the parties specify an "at the well" valuation point, the royalty holder must share in post-production costs regardless of how the royalty is calculated.[57] This is generally the case even when the agreement calls for payments based on the "amount realized" or "proceeds." Allowing the holder of an "at the well" royalty to escape his responsibility for post-production costs would improperly convert the royalty interest from a royalty on raw products at the well to a royalty on refined, downstream products.[58]

BlueStone's expansive reading of this passage is not supported by either the contract language at issue or our precedent.

To say that "amount realized" does not negate the force of "at the well" language does not equate to a rule that "at the well" language supersedes all other language. Nor did we speak to the effect of such language when the parties themselves have agreed what terms of their contract will control. Contrary to BlueStone's argument, *Burlington Resources* neither altered the legal landscape nor created a rule of "at the well" supremacy. To the contrary, it applied the unremarkable principle that contracts must be construed according to their terms.[59]

---

[57] Citing *Judice*, 939 S.W.2d at 136; *Heritage Res.*, 939 S.W.2d at 123 (plurality op.); *Heritage Res.*, 939 S.W.2d at 123 (Baker, J.); *Warren v. Chesapeake Expl., L.L.C.*, 759 F.3d 413, 417-18 (5th Cir. 2014)).

[58] *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, L.L.C.*, 573 S.W.3d 198, 205 (Tex. 2019) (internal citations omitted).

[59] *Id.* at 206 ("Both parties make plausible arguments. Ultimately, we are persuaded that Burlington's position is more faithful to *all of the contractual language chosen by the parties* and more aligned with the parties' intent as expressed in writing." (emphasis added)).

In *Burlington Resources*, we reconciled otherwise unmodified "amount realized" language with contract terms requiring royalties to be delivered "into the pipelines." We expressly recognized that an "amount realized" valuation, viewed in isolation, would be sufficient to prohibit deduction of postproduction costs under our precedent,[60] but under our precedent, contract language cannot be construed in isolation.[61] Examining the parties' agreement as a whole, we interpreted language requiring royalties to be delivered "into the pipelines, tanks or other receptacles with which the wells may be connected" as equivalent to calculating royalties "at the well," which produced a "net amount realized" royalty formula.[62] But unlike the lease here, *Burlington Resources* did not involve conflicting royalty formulas, "gross" valuation language, or a provision directing how to resolve conflicts. The contract terms *Burlington Resources* evaluated did not inherently conflict, but the terms used in BlueStone's lease do.[63] Nothing in *Burlington Resources* can reasonably be viewed as repudiating the notion that "gross" and "net" are opposite calculations or as favoring one over the other when both are present. Here, the parties expressly agreed to resolve the conflict in favor of a royalty free of postproduction costs, and courts must enforce unambiguous contracts as written. We accordingly hold that BlueStone wrongfully deducted postproduction costs in satisfying its royalty obligations to the Lessors.[64]

---

[60] *Id.* at 205 ("Viewed in isolation, the Valuation Clause's definition of 'value' [as the amount realized for the sale] provides considerable support for [the] position" that "this language creates a royalty free of post-production costs.").

[61] *Id.* ("But we must examine the entire Valuation Clause in its context and in conjunction with other clauses to which the parties agreed, including the immediately preceding Granting Clause [which requires delivery of royalties 'into the pipelines.']").

[62] *Id.* at 207 & 211.

[63] *See Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 135-37 (Tex. 1996) (holding that the term "gross proceeds realized at the well" is ambiguous due to an inherent internal conflict but the term "net proceeds realized at the well" is not ambiguous and expressly contemplates deductions).

[64] The Addendum's "gross value received" provision is accompanied by language stating that "all royalties accruing under this Lease . . . shall be without deduction, directly or indirectly," of myriad postproduction costs. The Lessors

## B. Plant Fuel and Compressor Fuel

Regardless of how royalties are calculated, Bluestone claims a royalty-free right to use leasehold gas in off-lease operations so long as any such use "benefits" or "furthers" the lease operations. Citing the mineral lease's "free use" clause, BlueStone does not pay any royalties on volumes of gas used as Plant Fuel and Compressor Fuel. The parties dispute whether this practice falls within the free-use clause's scope.

A "free use" clause is a provision in an oil and gas lease that "governs the right of a lessee to use products derived from the leased premises in the operation of said lease."[65] When such a clause is present in a lease, free-use gas is excluded when calculating the lessor's royalty on production.[66] The right to freely use gas is often limited to the leased premises,[67] but the parties are free to contract differently.[68] As with most mineral-lease disputes, whether a free-use clause is geographically unconstrained depends on whether the parties' lease expresses such an agreement.[69]

---

argue the Addendum's no-deductions provision plainly precludes deduction of postproduction costs consistent with the "gross value received" formula. BlueStone urges the Court to disregard the no-deductions provision, describing it as mere surplusage with respect to an "at the well" valuation because there are no postproduction costs at the wellhead and thus no such costs to deduct. In the context of other leases, no-deductions provisions have been construed as surplusage with respect to royalties valued at the well or as redundant of gross proceeds calculations. *See Chesapeake Expl., LLC v. Hyder*, 483 S.W.3d 870, 873-74, 876 (Tex. 2016); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 130-31 (Owen, J.) (plurality op.); *Heritage Res.*, 939 S.W.2d at 122-23 (Baker, J.). But we need not consider whether the specific language of the particular leases at issue would lead to a different conclusion here because, even without considering the Addendum's no-deductions provision, deduction of postproduction costs is not permitted under the controlling royalty provision.

[65] *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 855 (N.M. 2012) (citing 3 WILLIAMS & MEYERS, § 644.5, at 573-574.1).

[66] *Id.* at 856 (citing 3A Summers, *The Law of Oil and Gas*, § 33:12, at 160 (3d ed. 2006)).

[67] *Id.* (citing 3 WILLIAMS & MEYERS, § 661.4, at 763); *accord Anderson Living Trust v. Energen Res. Corp.*, 886 F.3d 826, 843 (10th Cir. 2018) (same).

[68] 3 WILLIAMS & MEYERS, § 661.4, at 763 ("The parties are free to authorize the provision of free gas without limitation if their intent is expressed in the lease.").

[69] *See id.*

## 1. The Parties' Agreement

The royalty clause in the BlueStone lease broadly requires payment for gas "sold or used off the premises or for the extraction of gasoline or other product therefrom," but

> Lessee shall have free from royalty or other payment the use of . . . gas . . . produced from said land in all *operations which Lessee may conduct hereunder*, including water injections and secondary recovery operations, and the royalty on . . . gas . . . shall be computed after deducting any so used.[70]

The court of appeals held that the lease limits free use of gas to operations conducted on the leased premises by (1) limiting free use to "operations . . . hereunder," (2) describing operations under the lease as those "thereon" the leased premises, and (3) giving free-use examples that are limited to on-lease activities.[71] We agree that the lease's plain language contemplates free use limited to the leased premises and does not, by express language or otherwise, make any use that "benefits" or "furthers" the lease operations royalty free.[72]

---

[70] Emphasis added.

[71] 601 S.W.3d 848, 874-77 (Tex. App.—Fort Worth 2019). The lease provides:

> Lessor . . . hereby grants, leases[,] and lets exclusively to Lessee for the purpose of investigating, exploring, prospecting, drilling[,] and mining for and producing oil, gas, sulphur, fissionable materials[,] and all other minerals (whether or not similar to those mentioned), conducting exploration, geologic and geophysical tests and surveys, injecting gas, water[,] and other fluids and air into subsurface strata, laying pipelines, establishing and utilizing facilities ~~for the disposition of salt water~~, dredging and maintaining canals, building roads[,] bridges, tanks, telephone lines, power stations[,] and other structures ***thereon***, and on, over[,] and across lands owned or claimed by Lessor adjacent and contiguous thereto necessary to Lessee in operations to produce, save, take care of, treat, transport[,] and own said minerals, the following described land in Hood & Somervell Counties, Texas[.] (Emphasis added.)

Although the granting clause in the Printed Lease also extends "operations" to the lessor's adjacent and contiguous lands as "necessary," the Addendum retracts that extension: "ANYTHING HEREIN TO THE CONTRARY notwithstanding, this Lease includes only those lands described in this Lease and does not include any land owned or claimed by Lessor that is adjacent or contiguous to the land described in this lease."

[72] Despite BlueStone's argument to the contrary, this construction does not render meaningless the language requiring royalties to be paid for off-premises uses. Rather, the two provisions act in harmony by requiring royalty payments for off-premises uses while expressly exempting any royalties for on-premises uses (i.e., "you owe a royalty for anything you sell or use off premises but you do not owe a royalty for anything you use on premises"). Both provisions remain effective.

19

This Court has not had occasion to resolve a dispute involving a free-use clause, and the intermediate appellate court cases the parties cite are not instructive.[73] The most relevant case law the parties rely on comes from jurisdictions outside of Texas. A case from North Dakota, *Bice v. Petro-Hunt, L.L.C.*,[74] turns on pragmatism more than contract language. A case from New Mexico, *ConocoPhillips Co. v. Lyons*,[75] follows *Bice* in construing specific lease language that expressly embodies the same pragmatic principle. And an opinion from the Tenth Circuit, *Anderson Living Trust v. Energen*,[76] yields a split decision as to the scope of free-use clauses in leases governed by New Mexico and Colorado law. We examine these cases in turn.

In *Bice*, the North Dakota Supreme Court analyzed "free use" clauses allowing the lessees to (1) "use, free of cost, gas, oil and water produced on said land for its operation *thereon*" and (2) "have free use of oil, gas and water from said land . . . for all its operations *hereunder*."[77] The dispute concerned the lessees' practice of piping gas from multiple leases to centrally located tank batteries and using the piped gas to conduct operations that collectively benefited all the leases.[78]

---

[73] *Highmount Expl. & Prod. LLC v. Harrison Ints., Ltd.*, 503 S.W.3d 557, 561 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (royalty clause required royalties based on "the gross proceeds for gas used or utilized *on or off* the Subject Interests, such as gas used for fuel" (emphasis added)); *Tana Oil & Gas Corp. v. Cernosek*, 188 S.W.3d 354, 362-63 (Tex. App.—Austin 2006, pet. denied) (no royalties were due on gas-lift fees because they were production costs and none of the lease provisions changed that general rule; to the contrary, the free-use clause confirmed that such an on-lease use was exempt from the royalty calculation); *Atlantic Richfield v. Holbein*, 672 S.W.2d 507, 515-16 (Tex. App.—Dallas 1984, writ ref'd n r.e.) (faced with contractual silence regarding allocation of gas that was commingled coming out of the wellheads, the court relied on industry custom and usage in holding the lessee owed no royalty on allocated volumes of gas used in compression operations); *Mitchell Energy Corp. v. Blakley*, 560 S.W.2d 740, 743-44 (Tex. App.—Fort Worth 1977, writ ref'd n.r.e.) (gas sold by the lessee to a third-party contractor for drilling operations that occurred *only on the leased premises* fell within the scope of a free-use clause permitting the lessee's "free use of oil, gas, coal and water from said land . . . for all operations hereunder").

[74] 768 N.W.2d 496 (N.D. 2009).

[75] 299 P.3d 844 (N.M. 2012).

[76] 886 F.3d 826 (10th Cir. 2018).

[77] 768 N.W.2d at 503 (emphases added).

[78] *Id.* at 502-03.

20

The record established that "[t]he functions performed by central tank batteries [were] the same functions normally performed at individual well sites," and by consolidating tank batteries in lieu of replicating those operations on each lease, both lessor and lessee benefited.[79] The centralized tank batteries were mutually beneficial because they were "more efficient resulting in less overall use of lease gas, minimize[d] surface disturbance and allow[ed] hydrocarbons to be recovered from gas on which the lessors receive[d] royalties."[80]

The court held this off-lease use was free of the royalty obligation.[81] In so holding, the court observed that limiting free use to on-lease operations would produce "an absurd result" under the circumstances presented "because it would require lessors who have a central tank battery on their property to bear the entire burden of the 'free use' clause, notwithstanding benefits conferred on other lessors."[82] Rather than focusing on the specific lease language, the court summarily concluded that because the lessees were using the gas "in furtherance of the lease operations," the free use clause did not limit the lessees' free use of the gas to the leased premises.[83]

Although the holding in *Bice* is broadly written, the gist seems to be that but for the lessee's consolidation of operations, the disputed volumes of gas would have been consumed on-lease and therefore free of royalty, and the consolidation of the tank-battery operations did not harm the lessors but instead provided a benefit. While stating an expansive rule of free use, the court

---

[79] *Id.* at 503.

[80] *Id.*

[81] *See id.* at 503-04.

[82] *Id.* at 504.

[83] *Id.*

effectively treated the off-lease use as a surrogate for what would otherwise have been royalty-free on-lease use.

In *Lyons*, the dispute concerned plant and field fuel the lessees provided to postproduction service providers as partial compensation for those services.[84] In holding that the lessees were "entitled to the free use of both plant and field fuel so long as it was used in the operation of the lease," the New Mexico Supreme Court favorably cited *Bice*'s holding that a free-use clause conferring a royalty-free right to use gas "produced on said land for its operations thereon" allowed gas to be used off-lease to "further the lease operations."[85]

In holding that use of plant and field fuel by third parties was not subject to royalty payments, the court quoted the lease's free-use and granting clauses and referenced the lease's "net proceeds" royalty calculation.[86] The free-use clause gave the lessee "any and all rights and privileges *necessary, incident to or convenient for the economical operation of said land*, for oil and gas, with [the] right for such purposes to the *free use* of oil, gas, casing-head gas, or water *from* said lands."[87] In turn, the granting clause gave the lessee the right to use the land "for the sole and only purpose of exploration, development and production of oil and gas *thereon* and *therefrom* with the right to own all oil and gas so produced and saved therefrom and not reserved as royalty by the lessor."[88] Taken together, the court deduced that these provisions entitled the lessee "to the free use of oil and gas produced *from* the leased premises, regardless of where the

---

[84] *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 855 (N.M. 2012).

[85] *Id.* at 856 (stating the holding in *Bice*, 768 N.W.2d at 502-03).

[86] *Id*.

[87] *Id.* (first emphasis added) (alteration in original).

[88] *Id*.

use occurred, so long as the oil and gas was being used to further the economical operations of said land."[89]

The court observed that free use is generally limited to on-lease uses "unless the clause expressly states otherwise," but the language in the particular lease at issue extended the right to use gas "incident to or convenient for the economical operation of said land" and authorized the deduction of postproduction costs in calculating the royalty.[90] Based on the trial court's findings, the court held that the disputed field and plant fuel volumes were postproduction costs the lessees remitted to postproduction service providers for the development and production of the leased premises.[91] And because the gas was used for such purposes, and was neither sold nor saved by the lessees, no royalty was due.[92] The analysis in *Lyons* is more conclusory than explanatory, but the lease language there is notable in extending free use to operating the lease "economical[ly]," which was the rationale that drove the outcome in *Bice* notwithstanding the absence of similar lease language.

All in all, we find *Anderson Living Trust* to provide guidance that is more closely tethered to the meaning of lease language that is substantially similar to the BlueStone lease. There, the Tenth Circuit analyzed two groups of leases—one group subject to New Mexico law and the other governed by Colorado law. Analysis of the lease language led the court to conclude that both sets of leases limited the lessee's free use of gas to the leased premises. But the court concluded that

---

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

23

New Mexico takes a broader view of free-use clauses that extends to off-lease uses while Colorado does not.[93]

The New Mexico leases gave the lessors "the right to use free of cost, gas, oil and water found on said land for its *operations thereon*, except water from the wells of the lessor."[94]  Because "thereon" means "on that," the court interpreted the lease as limiting free use "of gas 'found on said land' [to] operations 'on that' land."[95]  But the court determined that "[b]y favorably citing *Bice* [in *Lyons*], the New Mexico Supreme Court seems to have suggested that if confronted with a 'free use' clause [with similar language] it would rule the same way [as *Bice*]."[96]  Accordingly, the court concluded that under New Mexico law, "the phrase 'operations thereon' in the . . . 'free use' clause [in the New Mexico leases] is not a limitation on where the use of the gas may occur but rather a limitation on the purposes for which the gas may be used—furtherance of the lease operations."[97]

Construed so expansively, the provision was "easily satisfied" with respect to gas the lessee provided to third-party processors as partial payment for postproduction services that made the gas marketable.[98]  That service "further[ed] the lease operations" because "[w]ithout it, there would be no viable market for the product."[99]  Based on the broad holding in *Bice*, the court declined to

---

[93] *Anderson Living Trust v. Energen Res. Corp.*, 886 F.3d 826, 842 (10th Cir. 2018).

[94] *Id.* at 843 (emphasis added).

[95] *Id.* at 844 (citing https://www.merriamwebster.com/dictionary/thereon and BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "thereon" as "[o]n that or them")).

[96] *Id.* at 845.

[97] *Id*.

[98] *Id*.

[99] *Id*.

read it, or the New Mexico court's application of it, as narrowly extending only to off-lease uses that would normally occur on-lease.[100]

But the court reached the opposite result with regard to the leases subject to Colorado law, which were governed only by generally accepted contract-construction principles.[101] The clause at issue stated the lessee had "free use of oil, gas and water from said land . . . *for all operations hereunder*."[102] Applying the ordinary meaning of this language,[103] the court held that the lessee's free use was limited to operations that occurred on the leased lands.[104] The court reasoned that the "term 'hereunder' qualifies the phrase 'all operations,'" so for the free-use clause to apply, "the use of the gas must be for operations 'under or in accordance' with the lease or 'as provided for under the terms' of the lease."[105] And under the granting clause, the premises were leased "'for the sole and only purpose'" of conducting various activities "'*thereon* to produce, save, care for, treat and transport said substances produced from the land leased hereunder.'"[106] Given this language, the court explained that the on-lease limitation was manifest:

> As we read it, the purpose of the lease was to allow [the lessee] to produce oil and gas from the leased premises and to store oil and build infrastructure on the leased premises. Thus, the operations called for by the lease are those occurring on the

---

[100] *Id*. at 846.

[101] *Id.* at 850 ("The only reason we relied on *Bice* in resolving the New Mexico Trusts' fuel gas claim is because it was cited favorably in *Lyons*. No Colorado case has done so.").

[102] *Id.* at 848.

[103] *Id.* ("The plain meaning of 'hereunder' is 'under or in accordance with this writing or document' or '[a]s provided for under the terms of this document.' *See* https://www.merriamwebster.com/dictionary/hereunder; https://en.oxforddictionaries.com/definition/hereunder; *see also* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining 'hereunder' as '[l]ater in this document' or '[i]n accordance with this document'). The term 'hereunder' qualifies the phrase 'all operations.' So, to be free of royalties, the use of the gas must be for operations 'under or in accordance' with the lease or 'as provided for under the terms' of the lease.").

[104] *Id.* at 850.

[105] *Id.* at 848.

[106] *Id.* at 848-49.

leased premises. As a result, the plain language of the "free use" clauses in these leases suggests only gas used on the leased premises is free of royalty. Fuel gas used off the leased premises is not a free use.[107]

Further supporting this conclusion, the lease required the lessees to pay "royalty on gas (1) produced from a well on the leased premises and (2) sold *or used off the leased premises*."[108] The court therefore concluded that the lessee could not use gas "off the leased premises" without paying royalties because such action was prohibited by both the royalty clause and the "free use" clause:

> The royalty provisions require royalty to be paid on gas produced from the leased premises and sold or used off the leased premises. The "free use" clauses, on the other hand, suggest [the lessor] may use gas from the leased premises free of royalty only when the use of the gas occurs on the leased premise or, at the very least, when the use accords with the other provisions of the leases, including their royalty provisions.[109]

The free use clause in the BlueStone lease uses similar language and the lease has a similar purpose as the Colorado leases in *Anderson Living Trust*. As the court said there, the plain meaning of the language accords with on-lease uses and is not reasonably construed as extending to off-lease uses.[110] Given the parties' chosen language, it is unlikely they intended a construction of the free-use clause that would inject uncertainty and lead to a fact-finding mission to determine whether progressively more attenuated uses "benefit" or "further" the lease operations. The absence of any discernable limiting principle to BlueStone's favored construction further commends construing the free-use clause as restricted to on-lease uses. Accordingly, we agree

---

[107] *Id.* at 849.

[108] *Id.*

[109] *Id.* at 849-50.

[110] *See Hereunder*, BLACK'S LAW DICTIONARY (11th ed. 2019).

with the court of appeals that the free-use clause in the BlueStone lease does not authorize a royalty-free use of gas off-lease.

## 2. Joint Stipulations

Because the parties have stipulated that Plant Fuel is used off the leased premises by a third-party processor, royalties are due on that gas. A more difficult question arises with regard to use of Compressor Fuel, which occurs on the leased premises. Due to commingling of gas, BlueStone was required to account for the lessors' fractional share of the homogenous mass,[111] which it did. But as the court of appeals noted, BlueStone failed to produce evidence linking the fractional share to consumption by compressors on each of the leased premises.[112] As the court saw it, the Lessors were not complaining about the commingling of gas generally; rather, the problem was that the Lessors had no assurance that production from their leases was not being disproportionately used to facilitate production on other leases.[113] The court explained that "BlueStone never tells us or points to anything in the record that explains . . . why it cannot make a corresponding allocation to establish which portion of the commingled gas is used to power compressors on Appellees' leases and on leases owned by other lessors."[114] Based on the failure to account for consumption of the fractional share by compressors on each lease, the court affirmed

---

[111] *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 818-19 (Tex. 1974) ("As a general rule, . . . [w]here the [commingled] mixture is homogeneous, the goods being similar in nature and value, and if the portion of each may be properly shown, each party may claim his aliquot share of the mass. [T]he burden is on the one commingling the goods to properly identify the aliquot share of each owner [with reasonable certainty]; thus, if goods are so confused as to render the mixture incapable of proper division according to the pre-existing rights of the parties, the loss must fall on the one who occasioned the mixture." (internal citations omitted)).

[112] *See* 601 S.W.3d 848, 877 (Tex. App.—Fort Worth 2019).

[113] *Id*. at 878.

[114] *Id.* at 877.

27

the damages awarded for the entire stipulated value of each lease's fractional share of Compressor Fuel.[115]

The court of appeals was correct about the evidentiary disconnect, but awarding damages based on the entire value of Compressor Fuel was error because the evidence raises a fact issue as to the extent of damages, if any, from off-lease Compressor Fuel use.

According to the joint stipulations, BlueStone meters gas at each wellhead, commingles the leasehold gas with gas produced from other wells in the area, and transports the commingled gas off-premises for processing at Crestwood Plant, a third-party entity. BlueStone contracts with Crestwood to process and redeliver the commingled gas to BlueStone, and as part of that contract, Crestwood can use a portion of the gas to fuel its plant operations (Plant Fuel). After processing, Crestwood returns the remaining commingled gas to BlueStone. Some of the processed gas is retained by BlueStone to power compressors on the subject leases and other well sites that are not covered by the leases (Compressor Fuel).

Bluestone breached the lease by not paying any royalties on volumes of gas used off-premises by Crestwood as Plant Fuel; accordingly, the damages award was properly based on the stipulated value of each lease's fractional share. BlueStone also breached the lease to the extent it failed to pay royalties on volumes of gas used off-premises as Compressor Fuel, if any, but an award of damages based on the stipulated value of each lease's entire fractional share was not proper because the stipulations establish that at least some of the gas is used for compressors on at least some of the leases:

---

[115] *See id.* at 853, 878.

Crestwood redelivers a portion of the commingled processed gas to BlueStone, which BlueStone then transports to various well sites, *including well sites on lands covered by the Leases*. BlueStone uses some of this processed gas to power compressors ("Compressor Fuel"). The compressors are used in BlueStone's operations on various well sites, *including on the Leases*, to increase production of gas. The compressors used for BlueStone's operations on the [subject] Leases are located on the Leases.[116]

Neither party is entitled to summary judgment on damages for Compressor Fuel because the stipulations neither conclusively establish nor negate the existence of damages. Perhaps owing to the consolidation of the four separate lawsuits, the stipulations are vague as to what portion of the fractional share is returned to each lease and consumed in on-premises operations. But merely valuing the fractional share of Compressor Fuel attributable to each lease tells us nothing about what portion was used for BlueStone's compressor operations on each lease. Nevertheless, the record bears some evidence that the damages are not as extensive as the amount awarded. Because unresolved fact issues regarding the existence and extent of Compressor Fuel damages as to each leasehold preclude summary judgment, we reverse that portion of the judgment and remand to the trial court to determine damages, if any, for off-lease Compressor Fuel use.

### III. Conclusion

For the reasons stated, we affirm the court of appeals' judgment except as to the portion of the judgment awarding damages for royalties on Compressor Fuel, which we reverse and remand to the trial court. On remand, the trial court may consider whether to revisit the attorney's fee award in light of this narrow reversal.

---

[116] Emphases added.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED:** March 12, 2021